

FILED BY_____D.C.

MAR 0 9 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. PIERCE

## UNITED STATES DISTRICT COURT
## SOUTHREN DISTRICT OF FLORIDA

RYAN JEFFREY HOLMES,

     Plaintiff,

      vs.                                 Case NO __23-CIV-14066-Martinez/Maynard__

CAPTAIN KENT CAMPBELL,

in his individual and official capacity,

SERGEANT CHRISTIAN MATHISEN,

In his individual and official capacity,

SHERIFF DERYL LOAR,

In his individual and official capacity,

     Defendants

_____/

## COMPLAINT AND JURY TRIAL DEMAND

COMES NOW, Plaintiff RYAN HOLMES, in propria persona, sues Defendants to allege and verify the following Complaint:

## INTRODUCTION

1. This is an action for damages involving the violation of Plaintiffs federal civil rights, by Defendants acting under color of law, and contains causes of action pursuant to this Courts concurrent and pendant jurisdiction. The aggregate amount of damages claimed by the Plaintiff against all Defendants is in excess of $75,000.00.

## JURISDICTION AND VENUE

1

2. Jurisdiction of this court is invoked pursuant to 28 U.S.C. §1331 in that this is a civil action arising under the Constitution of the United States and pursuant to 28 U.S.C. §1343(a)(3) in that this action seeks to redress the deprivation, under color of law, of rights secured to the Plaintiff by the Fourth and Fourteenth Amendments to the Constitution of the United States of America.

3. Plaintiffs' claims for relief are predicated on 42 U.S.C. §1983, which authorizes actions to redress the deprivation, under color of law, of rights, privileges and immunities secured to the Plaintiff by the Constitution and laws of the United States.

4. Venue is appropriate in this Court as the illegal acts alleged to have been committed by Defendants against Plaintiff occurred solely within Indian River County, Florida.

5. All conditions precedent to bringing this action under state and federal law have occurred and has been satisfied.

**PARTIES**

6. Plaintiff, RYAN HOLMES, is a citizen of the State of Florida residing in Indian River County and is *sui juris.*

7. Defendant, DERYL LOAR, (hereinafter "LOAR"), was the Sheriff of Indian River County, Florida and is *sui juris.* At all material times, LOAR, oversaw and was in charge of the Indian River County Sheriff's Office ("hereinafter IRSO"), its agents and employees, including supervising, training, customs, establishing polices, and procedures to conform their conduct to the United States Constitution and Florida common law. LOAR is being sued in his individual and official capacities.

8. Defendant, CAPTAIN KENT CAMPBELL (hereinafter "CAMPBELL"), at all times material to this action, was employed by the IRSO as a deputy sheriff and in a supervisory position. He is being sued in his individual and official capacity.

9. Defendant, SARGENT CHRISTIAN MATHISEN (hereinafter "MATHISEN"), at all times material to this action, was employed by the IRSO as a deputy sheriff and in a supervisory position. He is being sued in his individual and official capacity.

## UNDERLYING FACTS

10. Plaintiff HOLMES was leaving his home to go grocery shopping at a nearby Publix in the early afternoon of March 13, 2019, and was at 1050 10th PL. Vero Beach, Florida.

11. Upon pulling out of his driveway in reverse, HOLMES noticed a white vehicle speeding towards him from behind. He began to travel eastbound on 10th Pl. but became alarmed when the white vehicle that was quickly approaching him caught up to him and began driving aggressively and in a unsafe manner. Unknown to HOLMES at the time, this vehicle was a unmarked police car belonging to IRSO and was being operated by defendant MATHISEN.

12. When the vehicle behind HOLMES was traveling in very close proximity to the rear bumper of his vehicle but did not activate emergency lights or a siren indicating they were law enforcement, HOLMES became concerned for his safety.

13. The vehicle HOLMES was operating was a 1997 Ford Expedition with dark tinted windows that prevented him from seeing who was driving the vehicle that was aggressively following him or how many occupants were in the vehicle.

3

14. They traveled several blocks before the situation quickly escalated when HOLMES approached the stop sign at 10th Pl and Old Dixie. HOLMES did not believe that the vehicle following him was law enforcement because it did not activate any lights or sirens indicating that it was. Because of this and the aggressive way he was being followed, HOLMES felt that if he were to stop his vehicle at the stop sign then his safety and possibly his life would be in danger. HOLMES ran the stop sign and attempted to flee from his unknown aggressor. He turned northbound onto Old Dixie Highway and when the pursuing vehicle also ran the stop sign and resumed aggressively following him, HOLMES feared for his life and attempted to flee to safety by accelerating his vehicle.

15. HOLMES did not have a working cell phone and was unable to call 911 for help. After HOLMES accelerated, he traveled a short distance to a traffic light located at Old Dixie Highway and 12th Street. The light was red and there were several cars in each lane which were quickly going to force HOLMES to stop his vehicle. Holmes felt he had no choice but to keep his vehicle moving or else be physically attacked and harmed by the occupant (or occupants) that were aggressively pursuing him. HOLMES slowed his vehicle until he saw an opening and then accelerated around the stopped vehicles and drove straight into oncoming traffic before quickly turning westbound through the intersection and narrowly avoiding a collision.

16. HOLMES accelerated to a high rate of speed and traveled approximately one mile before turning south on 20th Ave. Upon turning onto 20th Ave HOLMES traveled the short distance of approximately one block before turning into a driveway located at 1065 20th Ave. The home was owned and occupied by Kevin Wiseberg whom HOLMES knew personally and who was a friend of his family.

17. HOLMES exited his vehicle and fled into the safety of the woods behind Kevins house. At some point shortly thereafter both the unmarked vehicle driven by MATHISEN and uniformed deputies in patrol cars arrived on the scene. HOLMES fled the area.

18. At least ten deputies and a helicopter were dispatched to Kevins house and upon arriving they demanded to search his home to try and locate HOLMES. Kevin did not see HOLMES and had no idea what was going on but still complied and let deputies unsuccessfully search his home . Kevin is friends and use to be coworkers of both HOLMES mother, Barbara Altman, and the mother of HOLMES son, Andrea Schulze, so he called Barbara and informed her of what was happening.

19. Several hours went by and at some point, the IRSO dispatched a tow truck to remove HOLMES vehicle that was still legally parked in the driveway of a property owned by his friend Kevin.

20. Hours after fleeing to safety and now in the late afternoon part of the day HOLMES walked back to Kevins house at 1065 20th Ave to retrieve his vehicle, but it was gone. HOLMES saw Kevin on the back porch smoking a cigarette and when he approached Kevin he became upset and told HOLMES the sheriff's department had searched his home and in doing so had scared his wife and kids. Kevin instructed HOLMES to get off his property and that he was calling the sheriff department. HOLMES apologized to Kevin and told him he didn't know it was law enforcement who were chasing him and told Kevin to tell IRSO that he would be at the abandoned house directly across the street. Being how his friend had just told him to leave his property, IRSO had towed his vehicle, and he didn't have a cell phone to call anyone, HOLMES felt the abandoned house was his best option.

5

21. HOLMES walked around to the back of the abandoned home to wait for IRSO and sat down on a concrete step inside a small utility room The door that HOLMES had entered the utility room through was severely warped and heavily damaged, making it impossible for it to close completely or for it to stay open without physically holding it open.

22. As HOLMES sat on the step in the utility room for approximately 15 to 20 minutes when he heard the front door of the house open. Upon hearing the noise, he immediately stood up and saw through the window of the back door a uniformed sheriff's deputy whom he recognized to be MATHISEN walking through the front door of the house with a K9 walking in front of him. Upon seeing MATHISEN, HOLMES immediately put his hands on his head to communicate to him that he had no weapons and was peacefully surrendering.

23. HOLMES was standing straight up with his hands clearly on his head when CAMPBELL who did not announce himself, opened the exterior door of the utility room who had already drawn his taser and had it aimed directly at HOLMES. Upon seeing CAMPBELL with a taser pointed at him, HOLMES did not move. He did move forwards and he did not move backwards at all. Standing still with his hands on his head HOLMES clearly was not a threat to CAMPBELL or anyone else. When CAMPBELL saw HOLMES, he did not issue any commands or warnings or verbally communicate anything to him. CAMPBELL then discharged his taser into the chest of HOLMES striking him in his chest directly above his heart.

24. CAMPBELL did not announce his presence to HOLMES. CAMPBELL did not give HOLMES any commands to do anything. CAMPBELL gave no warning to HOLMES that he was about to deploy his taser. It is a fact that HOLMES was standing in the utility

6

room with his hands above his head and was not actively resisting CAMPBELL in any

way when he discharged his taser into the chest of HOLMES.

25. Upon impact of both taser probes lodging themselves into the chest of HOLMES, he

immediately began to be shocked and fell to his knees before collapsing onto his

stomach. CAMPBELL then issued his first command to HOLMES which was for him to

put his hands behind his back. Despite still being shocked HOLMES immediately

complied and put his hands behind his back.

26. While HOLMES was lying face down on the concrete with his hands behind his back and

in full compliance CAMPBELL, instead of handcuffing HOLMES continued to shock

him for a unknown period of time. HOLMES believes he briefly went unconscious and

does not know how long he was shocked. CAMPBELL then placed one of his knees onto

the back of HOLMES and proceeded to handcuff him.

27. HOLMES was lying face down on the concrete with his head turned sideways so that his

cheek was laying on the concrete. He could see the bottom half of CAMPBELL kneeling

over him.

28. Immediately after CAMPBELL handcuffed HOLMES he sprung up from his kneeled

position as if he was going to stand up. But he did not stand up. Halfway through the

motion of standing up CAMPBELL stopped. He then used gravity and the weight of his

6' 3" 250lb+ body to sadistically drive his knee that had just previously been resting on

the back of HOLMES, into his head.

29. Over and over HOLMES could see what looked like CAMPBELL quickly and partially

standing up right before feeling a violent impact to either his head or torso. CAMPBELL

was in a rage, and he struck HOLMES 10 to 12 times with his knee before he was done.

30. HOLMES hands were restrained behind his back, he was not actively resisting CAMPBELL in any way. During this entire incident in the utility room HOLMES did not say one word to CAMPBELL.

31. After the beating concluded, CAMPBELL commanded HOLMES to stand up. HOLMES could not stand up on his own. Campbell picked up HOLMES by placing his arm through the handcuffed arms of HOLMES and proceeded to partially drag him out of the utility room. They traveled approximately 5' before reaching the outdoor back porch area.

32. CAMPBELL stopped and pushed HOLMES onto his knees and then walked away. HOLMES doesn't know if he briefly went unconscious or if he just fell face forward onto face because he did not have the strength to hold himself up on his knees, but the next thing he does remember is someone telling someone else to pick him up and people laughing.

33. Someone grabbed HOLMES by the back of his shirt and pulled him back up onto his knees but this time whoever the person was held onto the back of shirt so he wouldn't fall again.

34. HOLMES head was hanging down but when he heard footsteps coming towards him he picked his head up briefly and opened his eyes and saw MATHISEN in close proximity of him raising his hand as if to strike him but instead displayed a cell phone which he then used to take picture of him. A trophy picture.

35. After the photo was taken CAMPBELL picked up HOLMES and they began slowly walking around the side of the house towards the street. After rounding the corner of the house CAMPBELL abruptly stopped walking. He had realized HOLMES was dragging the long metal wires that were attached to the Taser darts that were still lodged in the

chest of HOLMES. CAMPBELL then turned HOLMES towards him so that they were face to face and proceeded to pull the taser darts out of his chest with his bare hands.

36. Earlier, while HOLMES was being dragged out of the utility room right before he fell on his face, HOLMES had heard the voices of two different deputies tell him he that he had really fu*ked up going into the utility room because now he was being charged with burglary. HOLMES had thought the charge was trespassing if any.

37. After CAMPBELL pulled the prong out of HOLMES chest and while they were still face to face HOLMES told Campbell that if he did not charge him with burglary then he would not file a complaint against him for what CAMPBELL had just done to him. CAMPBELL did not verbally respond but did nod his head from up to down which indicated to HOLMES that they had a deal. HOLMES was never charged with burglary in relation to this incident.

38. CAMPBELL had to assist HOLMES walking the remainder of the way to a patrol car but as they began crossing 20th Ave. HOLMES saw his mother, Barbara Altman, who was standing next to the patrol car they were going to. As they slowly approached her, she began to see her sons' injuries and became upset. She repeatedly asked CAMPBELL and another deputy what had happened to him, but she was ignored.  At this time both HOLMES and his mother requested medical attention, but CAMPBELL denied their request saying HOLMES would be looked at when he got to jail. CAMPBELL put HOLMES in the back of a patrol car and shut the door. HOLMES had no injuries, cuts or bruises anywhere on his body prior to the incident with CAMPBELL.

39. Barbara began pleading with CAMPBELL to call an ambulance for her son, but CAMPBELL refused. Barbara then told CAMPBELL that if he wasn't going to call for

an ambulance then he needed to let her look at HOLMES injuries. CAMPBELL agreed.
He opened the back door of the patrol car and instructed HOLMES not to stand up but to
swing his legs out of the car but to stay seated. HOLMES complied and a few seconds
later Barbara returned from retrieving two bottles of water out of her vehicle and she
began to wash the blood off her son's face and head using her shirt so that she could
inspect his injuries. After she had used both bottles of water she stood up and told
CAMPBELL again that her son needed to be taken to the hospital and he replied that he
would get proper medical attention at the jail. Barbara was crying and asked
CAMPBELL if she could give her son a hug and he said "quickly". Barbara helped her
son stand up and she hugged him. HOLMES got back into the patrol car and
CAMPBELL shut the door. Barbara went home with her clothes stained with her son's
blood.

40. HOLMES was transported to Indian River County Jail where he was briefly seen by a
nurse who cleaned his cuts and washed the remainder of blood off his face. HOLMES
complained of a constant pain in his side and his chest, but the nurse told him that if it
still hurts tomorrow to fill out a medical request. The nurse did not visually inspect
HOLMES chest or any of his other injuries other than the ones on his face and head.

41.  HOLMES was then instructed by jail staff that his picture would be taken. Jail staff
manipulated the lights and took his picture several times to minimize his visible injuries.
Despite their efforts several cuts and bruises can be visibly seen in the booking picture of
HOLMES that was posted on the IRSO website.

42. HOLMES was booked for warrants VP2018948 (violation of probation) and 19-031-
2019-7333 (attempted burglary) and he was additionally charged with resisting arrest

without violence. The warrant for attempted burglary was unknown to HOLMES prior to being booked at the jail. HOLMES eventually pled no contest to the 3 charges and received a 210 day jail sentence. HOLMES was also issued two traffic tickets by MATHISON in relation to the vehicle pursuit, failure to stop at a stop sign and running a red light.

43. Despite having serious injuries HOLMES never received proper medical treatment. All requests by both him and his mother for CAMPBELL to take him to a hospital were denied. HOLMES was only seen once by a nurse for approximately 10 minutes when he first arrived at the jail and never by doctor. After complaining to medical staff for almost 2 months about the constant pain in his side, jail staff finally brought in an x-ray machine and pictures were taken of HOLMES rib cage. Even though the Xray report was printed on a common piece of paper when HOLMES requested a copy of his Xray report he was told inmates were not allowed to have medical documents. HOLMES was told by medical staff that he likely had two fractured ribs and that the doctor would see him soon but that never happened. Medical staff told HOLMES the only thing they could do for his injuries was give him Tylenol.

44. In support of his actions, CAMPBELL filed out a false Response to Resistance Report. It is alleged that CAMPBELL did not complete this report until several years later, probably shortly after HOLMES made a internal affairs complaint. The phone number CAMPBELL put on his RRR report for HOLMES is 772-559-9965, however HOLMES did not obtain this phone number until March of 2020. CAMPBELL has been accused of falsifying reports several times in the past and it is a widespread problem for the department. CAMPBELL is a supervisor and according to his report it appears he

investigated himself. No Taser Cartridge number was entered on CAMPBELLS RRR report. Due to policy violations and the dishonesty of CAMPBELL it is unknown how long CAMPBELL administered a Taser shock to HOLMES before handcuffing him.

45. CAMPBELL made two false statements in his Response to Resistance Report in order to justify his extreme use of force. CAMPBELL's false statements include:

    a. Claiming someone was holding the door of the utility room shut.

    b. Claiming HOLMES was moving towards him after he opened the door.

46. At the time of this incident CAMPBELL was a high-ranking Lieutenant in a supervisory position at the IRSO. His job duties did not include field work such as actively searching for suspects. It is unclear why he was even present on the scene. According to IRSO incident report 2019-00046970 the deputies who responded were Lozada, Barkwell, Hoffman, Scribner, Thimmer, Moskowitz, Skovsgard, Gomez (helicopter), Mathison, and Reeve. Nowhere in the report does it list Campbell was even there.

47. Deputy James Barkwell was the arresting officer who wrote the case report and took HOLMES to jail. Barkwell's report fails to mention any reference of CAMPBELL or that he had deployed his TASER into HOLMES chest. He also does not disclose that CAMPBELL proceeded to beat him while he was already handcuffed or that HOLMES fell on his face after he was dragged out of the utility room.

48. In January of 2023, HOLMES filed a Internal Affairs complaint in reference to this incident. The investigation has lasted over 3 months and is still ongoing. Throughout the investigation HOLMES fully complied with interview requests by Lt. Nolan of Internal Affairs. HOLMES made several requests to Lt. Nolan both verbally and in writing requesting a polygraph and/or voice stress test to be administered to him to verify his

allegations. Lt. Nolan always claimed to be "to busy" with other complaints to give

HOLMES a polygraph. Lt. Nolan refused to interview several key witnesses because

their testimony would likely hurt CAMPBELL and MATHISEN.

49. The IRSO Internal Affairs investigation policy is to allow the accused Deputy to review

all the evidence against them including witness statements before the accused Deputy

themselves makes a statement or answers any questions. Accentually, this policy gives

the accused Deputy all the correct answers to the test right before giving him the test.

50. CAMPBELL's multiple instances of lying and providing false sworn statements are

viewed by IRSO as "major offenses". Improper use of a Taser and the use of excessive

force resulting in injury are also viewed by IRSO as "major offenses".

51. By Tasering HOLMES when he was standing with his hands on his head, beating him

while he was handcuffed, dragging him outside and allowing him to fall on his face and

then denying him medical treatment, in addition to breaking the law and violating

HOLMES civil rights, CAMPBELL also violated numerous IRSO policies in reference to

the Response to Resistance policy. These are as follows:

    a.  Chapter "X" section "a": The use of the taser shall be initiated after reasonable

        attempts at passive control have failed or shown to be appropriate for a given

        situation.

    b.  Chapter "X" section "b": Once the taser has been applied and the subject is under

        control, the deputy is responsible for the care of the subject until such time as the

        subject has recovered from the effects of the taser.

    c.  Chapter "V "section "a": Members of the Sheriffs Office shall use only the

        reasonable force necessary to affect lawful objectives and shall not strike or use

physical response against any person except, when necessary, in self-defense, in

defense of another, to overcome physical resistance to a lawful arrest, performing

official duties, or to prevent the escape of an arrested person.

d.  Chapter "X" section "e": It shall be the duty of all supervisors who issue a Taser

cartridge to log the cartridge identification number upon issue and have the deputy

sign for the cartridge.

e.  Chapter "XI" section "a", When non-lethal response has been utilized i.e., OC

spray, Baton, Taser, or Less Than Lethal Munitions, the deputy will observe the

subject to detect changes in condition, flushing chemical agents from the eyes with

fresh water when applicable, applying First Aid/Taser probe removal, and

evaluation by paramedics if necessary.

52. CAMPBELL violated HOLMES civil rights, granted to HOLMES by the Fourth, Eighth

and Fourteenth Amendments of the United States Constitution, by,: (a) discharging his

Taser into the chest of HOLMES when he was not actively resisting; (b) needlessly

administering additional shocks from his already discharged taser to HOLMES; (c)

handcuffing HOLMES and then striking him over 10 times with his knee when he was

not resisting; (d) allowing HOLMES to fall on his face after he had been seriously

beaten; (e) refusing to allow HOLMES proper medical attention.

53. MATHISEN, in the course of his conduct violated numerous IRSO policies. Including but

not limited to:

a.  Chapter "IV" section "a": Any deputy who observes the arrest or incident resulting in

injury or serious physical injury shall complete a Supplemental or Incident Report

and submit it to their immediate supervisor, as soon after the incident as practical.

    b.  General Order 2531.00 provides sheriff's personnel are required to maintain job knowledge and skills required for the performance of official duties.

        General Order 2531.00 provides sheriff deputies shall adhere to standard operating procedures, polices, and directives, and shall faithfully execute all of the duties and responsibilities of their assigned position.

    c.  General Order 4091.00, pursuit of motor vehicles.

    d.  Chapter "V "section "a": Members of the Sheriff's Office shall use only the reasonable force necessary to affect lawful objectives and shall not strike or use physical response against any person except, when necessary, in self-defense, in defense of another, to overcome physical resistance to a lawful arrest, performing official duties, or to prevent the escape of an arrested person.

54. MATHISEN, violated HOLMES civil rights, granted to HOLMES by the Fourth, Eighth and Fourteenth Amendments of the United States Constitution, by, (a) witnessing and failing to intervene or stop CAMPBELL from using excessive force which resulted in injury, (b) using excessive and unreasonable force by attempting a unlawful traffic stop of HOLMES while operating a unmarked vehicle that was not equipped with emergency lights or siren (c) using excessive and unreasonable force by initiating a vehicle pursuit with no way to communicate to HOLMES that he was law enforcement (d) using excessive and unreasonable force by pursuing HOLMES for several miles which put the lives of HOLMES, himself and numerous citizens in jeopardy by pursuing . Any reasonable person would find his actions to be reckless and excessive of force.

55. All the foregoing violations of HOLMES civil rights caused him injury and damages. These violations were of the type and character as to which any reasonable person would

find as being unreasonable and as unconstitutional use of force, and further, Florida law is clearly established and prohibits such conduct is unconstitutional, including but not limited to, the case law of Federal Court of Appeals of the United States, 11th circuit and the Supreme Court.

56. LOAR, was the Sheriff of Indian River County at the time of this incident and was responsible for the proper and efficient training of deputy sheriffs, the investigation and termination of deputy sheriffs, in addition to the enforcement of the laws, policies, procedures and regulations of IRSO, the laws, regulations and Constitution of the State of Florida, and its laws, regulations and Constitution of the United States.

57. LOAR, as sheriff of Indian River County at the time of this incident, was responsible for the investigation of improper acts of officers and all personnel of the IRSO regarding the enforcement of the laws, policies, regulations, and practices of IRSO, regulations and Constitution of the State of Florida, and the laws, regulations and Constitution of the United States.

58. CAMPBELL has a long-documented history of unprovoked violence, vindictive behavior, complete disregard for law and policy and abusive behavior towards the citizens of Indian River County. 15 complaints in 5 years, numerous excessive force lawsuits which named CAMPBELL as a defendant in addition to numerous violations of IRSO policy and regulations, CAMPBELL only received one letter for counseling, LOAR did not provide the appropriate punishment.

## COUNT I 42 U.S.C. §1983 DEPRIVATION OF PLAINTIFF'S CIVIL RIGHTS AGAINST CAMPBELL-(EXCESSIVE FORCE)

59. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 58, inclusive, as fully set forth herein.

60. The actions of CAMPBELL occurred within the scope of his employment with IRSO, under color of law, having occurred within the authorized time and space limits of his duties and for a purpose to serve LOAR.

61. At all times material hereto, CAMPBELL had a legal duty not to violate HOLMES' constitutional rights and to only use the necessary amount of reasonable force, if any, to arrest HOLMES.

62. On March 13, 2019, CAMPBELL violated HOLMES rights under the Fourth and Fourteenth Amendments of the United States Constitution of the United States by using an excessive and unreasonable amount of force to arrest HOLMES. CAMPBELL was employed by IRSO for over 30 years mostly in a supervisory position so he knew or should of known and every reasonable deputy sheriff in his position would of concluded that HOLMES had a Fourth Amendment right not to be tasered by CAMPBELL when he had willfully submitted and was not actively resisting.

63. On March 13, 2019, CAMPBELL violated HOLMES rights under the Fourth and Fourteenth Amendments of the United States Constitution of the United States by using an excessive and unreasonable amount of force to arrest HOLMES so he knew or should of known and every reasonable deputy sheriff in his position would of concluded that HOLMES had a Fourth Amendment right to not be repeatedly stricken in the head and torso while he was handcuffed. HOLMES also had a Fourth Amendment right not to be allowed to fall on his face after he was beaten.

64. At no time did HOLMES present an immediate danger or threat to CAMPBELL or any other deputy. When CAMPBELL Tasered and then struck HOLMES while he was in handcuffs, he used unreasonable and clearly excessive force on HOLMES. At no time did HOLMES consent to such bodily harm/offensive conduct.

65. The unlawful acts of CAMPBELL were performed knowingly, intentionally, and maliciously, and were performed in a reckless manner with deliberate indifference to the health, safety, and civil rights of HOLMES, and for this reason HOLMES is entitled to a award of punitive damages.

66. These violations were of a type or character as to which any reasonable person would be aware and the law prohibiting such conduct as unconstitutional is clearly established in Florida, in federal case law, including that of the Federal Court of Appeals of the United States, 11th Circuit, and under the case law of the U.S. Supreme Court.

67. As a direct result of the unlawful conduct of CAMPBELL, HOLMES was deprived of his civil rights and he was forced to suffer serious physical injuries, crippling anxiety, mental anguish, damage to his reputation, constant fear of law enforcement, damage to his child custody case, three years of depression, humiliation, and because he was denied proper medical care, he was forced to endure 210 days of incarceration while in constant pain with no access to a hospital.

> WHEREFORE, Plaintiff demands judgement against CAMPBELL for compensatory and punitive damages, costs and any other relief this Court determines is appropriate in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs and any other relief this court determines is appropriate.

## **COUNT II: 42 U.S.C. §1983 DEPRIVATION OF PLAINTIFF'S CIVIL**

## **RIGHTS AGAINST MATHISEN (EXCESSIVE FORCE)**

68.  Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 58, inclusive, as it fully set forth herein.

69.  The actions of MATHISEN occurred within the scope of his employment with IRSO, under color of state law, having occurred within the authorized time and space limits of his duties and for a purpose to serve LOAR.

70.  At all times material hereto, MATHISEN had a legal duty not to violate HOLMES' constitutional rights and to only use the necessary amount of force, if any, to arrest or to attempt to arrest HOLMES.

71.  The unlawful acts of HOLMES were performed knowingly, intentionally, and maliciously, and were performed in a reckless manner with deliberate indifference to the health, safety, and civil rights of HOLMES, and for this reason HOLMES is entitled to a award of punitive damages

72.  On March 13, 2019, MATHISEN subjected HOLMES to excessive and unreasonable force while attempting to arrest HOLMES on a warrant. MATHISEN violated HOLMES Fourth and Fourteenth Amendments of the United States Constitution of the United States and violated HOLMES's right to be free from unreasonable searches and seizures, by waiting for HOLMES to leave his home and initiating a vehicle pursuit while he was operating a unmarked vehicle that was equipped with no emergency lights or siren. By failing to identify himself MATHISEN put not only HOLMES at risk of serious injury and possibly death, but MATHISEN also put himself and numerous citizens at great risk of serious injury and possibly death.

73. At no time did HOLMES resist being arrested by MATHISEN. Florida law clearly states that a law enforcement officer must clearly communicate to the driver of a vessel by identifying themselves or by using emergency lights and/or a siren before they are required to pull over. At no time was HOLMES a threat to MATHISEN or anyone else until MATHISEN began to aggressively pursue HOLMES without identifying himself. This caused HOLMES to be in fear of his life and he attempted to flee his aggressor.

74. MATHISEN knew or should have known and every reasonable deputy sheriff in his position would have concluded that HOLMES had a Fourth Amendment right not to have a deputy sheriff in a unmarked vehicle that was equipped with no emergency equipment wait for him to leave his home and then aggressively following him in a manner that made him fear for life. It was impossible for HOLMES to know if the person operating the vehicle that was pursuing him was law enforcement. According to Florida law all vehicles that are not equipped with emergency equipment must follow the same rules and laws as everyone else. Aggressively following HOLMES and without properly communicating or even attempting to communicate to HOLMES that MATHISEN was law enforcement was unreasonable and a excessive use of force.

75. Several hours after the vehicle pursuit HOLMES was sitting in a utility room of an abandoned house waiting for the sheriff department. HOLMES saw MATHISEN come in through the front door with a k9 and he stood up and immediately put his hands on his head. Very shortly thereafter HOLMES was tasered, beaten while he was handcuffed and then dragged outside where he was allowed to fall face first onto the concrete. MATHISEN witnessed CAMPBELL violating his rights and causing him serious injury and did nothing.

76. After CAMPBELL dragged HOLMES out to the back porch and pushed him on his knees, HOLMES fell on his face. MATHISEN did not help HOLMES but instead, while another Deputy picked HOLMES up by his shirt, MATHISEN took out his cell phone and took and picture of HOLMES. The Plaintiff has made numerous requests to IRSO public records, but MATHISEN has failed to produce the picture.

77. MATHISEN had a duty to protect HOLMES from constitutional violations by fellow officers. Therefore, an officer who witnesses a fellow officer violating an individual's constitutional rights may be liable to the victim for failing to intervene under federal law.

78. These violations were of a type or character as to which any reasonable person would be aware, and further, the law prohibiting such conduct as unconstitutional is clearly established in Florida, in federal case law, including that of the Federal Court of Appeals of the United States, 11th Circuit, and under the case law of the Supreme Court.

79. The unlawful acts of MATHISEN were performed knowingly, intentionally, and maliciously, and were performed in a reckless manner with deliberate indifference to the health, safety, and civil rights of HOLMES, and for this reason HOLMES is entitled to a award of punitive damages.

80. As a direct result of the unlawful conduct of MATHISEN, HOLMES was deprived of his civil rights and he was forced to suffer serious physical injuries, crippling anxiety, mental anguish, damage to his reputation, constant fear of law enforcement, damage to his child custody case, three years of depression, humiliation, and because he was denied proper medical care, he was forced to endure 210 days of incarceration while in constant pain with no access to a hospital

WHEREFORE, Plaintiff demands judgement against MATHISEN for compensatory and punitive damages, costs and any other relief this Court determines is appropriate in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs.

## COUNT III: 42 U.S.C. 1983 DEPRIVATION OF PLAINTIFF'S CIVIL RIGHTS AGAINST LOAR

81. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 58, inclusive, as if fully set forth herein.

82. At all material times, LOAR was responsible for IRSO, its agents and employees, including supervising, overseeing, training and establishing policies, customs and procedures to conform their conduct to the United States Constitution and Florida common law.

83. At all times material hereto, LOAR was charged with the responsibility of adopting and implementing rules and procedures for the proper and efficient maintenance, supervision and control of the officers of the IRSO. These duties include, but are not limited to:

    a. To create, adopt and implement rules, regulations, practices and procedures, toward hiring and retaining law enforcement officers who do not have a propensity of using excessive force through sadistic violence on a citizen who was not resisting while he was both unrestrained and restrained when excessive force was administered.

    b. To create, adopt and implement rules, regulations, practices and procedures, toward hiring and retaining law enforcement officers who do not have a propensity witnessing other officers/supervisors violate a citizen's civil rights and not reporting it.

c.  To create, adopt and implement rules, regulations, practices and procedures, toward hiring and retaining law enforcement officers who do not have a propensity of engaging in illegal and dangerous vehicle pursuits that put the lives of all parties and innocent civilians in jeopardy.

d.  To create, adopt and implement rules, regulations, practices and procedures, toward hiring and retaining law enforcement officers who do not have a propensity for not charging suspects with felony crimes in exchange for the agreement not to file a complaint against them.

e.  To implement rules, regulations, policies, practices and procedures for the proper and efficient supervision, discipline and control of law enforcement officers to prevent officers from engaging in vehicle pursuits without the proper emergency equipment installed in their vehicles.

f.  To implement rules, regulations, policies, practices and procedures for the proper and efficient supervision, discipline and control of law enforcement officers to reduce or eliminate instances of lying and to properly punish those officers who commit same.

g.  To implement rules, regulations, policies, practices and procedures necessary to properly and fully investigate claims by citizens that law enforcement officers used unnecessary and excessive force in the course of their duties.

h.  To implement rules, regulations, policies, practices and procedures necessary to identify and terminate employees and supervisors that repeatedly use excessive force and unprovoked violence towards citizens.

84. LOAR had a legal duty to HOLMES to exercise reasonable care and judgment in hiring, training and retaining safe and competent employees and supervisors. LOAR knew or

should of known that CAMPBELL was dangerous and failed to take any action to terminate his employment or relieve him of his supervisory duties. LOAR failed in his duty and that failure caused HOLMES damages.

85. LOAR failed to adequately train and supervise and direct IRSO and its deputy sheriffs and their supervisors concerning the rights of the citizens they encounter in their duties, such that it is a policy, custom and practice for deputy sheriffs, including CAMPBELL and MATHISEN, to take reckless and extreme actions against the citizens they encounter, including HOLMES.

86. LOAR was on notice, by a history of widespread abuse and violence, the need to correct the dangerous and extreme actions of IRSO and of its supervisors and its deputy sheriffs concerning the rights of the citizens they encountered in the course of their duties. It was LOAR's policy, practice and custom for sheriff deputies, including CAMPBELL and MATHISEN, to take extreme and violent actions against the citizens they encountered, including HOLMES.

87.  The need for better training and competent supervisors was so obvious but LOAR instead made a conscious choice not to terminate CAMPBELL's employment. And in doing so LOAR allowed CAMPBELL to spread corruption throughout the entire sheriff's department including into the minds and hearts and minds of many deputy sheriffs. LOAR's conscious choice not to act has resulted in the violation of HOLMES's civil rights.

88. .The IRSO public records department has refused to provide the Plaintiff with the requested public information documents regarding the disciplinary history of CAMBELL and MATHISEN. It is unknown how many citizen complaints have been filed against

CAMPBELL and MATHISEN. The IRSO public records department under the direction of LOAR has been involved in numerous complaints and has been the subject of several lawsuits alleging Florida Statue 119 violations. The complaints below regarding CAMPBELL are only from 2015 to 2020. The Plaintiff has made several public records requests trying to obtain CAMPBELL's and MATHISEN's disciplinary records, however, only the complaints listed below were disclosed.

89. In October of 2015, in a complaint (2015-CC31) filed as to CAMPBELL ordering a deputy to inappropriately enforce traffic laws. UNFOUNDED

90. In October of 2015, another complaint (2015-CC28) was filed as to CAMPBELL ordering a deputy to inappropriately enforce traffic laws. UNFOUNDED

91. In January of 2017, a citizen complaint was filed as to CAMPBELL verbally threatening a citizen. UNFOUNDED.

92. On February 5, 2018, CAMBELL received a Letter of Counseling for violating polices, Neglect of Duty and Job Knowledge and Performance and General Proficiency

93. In March of 2017, a citizen complaint was filed as to CAMPBELL *"demonstrated implicit bias and extreme hostility"*. CAMPBELL demanded a citizen to stop recording him with her cell phone. The investigation concluded "there is no evidence that would indicate Lt. Campbell violated any Agency policies or procedures. As such, the complaint is UNFOUNDED.

94. In June of 2017, a citizen's complaint (2017-CC-0046) alleged CAMPBELL had threatened a citizen and they perceived it as harassment. The complaint was UNFOUNDED.

95. In September of 2017, a citizen's complaint (2017-CC-0067) was filed as to CAMPBELL calling a citizen a liar and accusing her of making frivolous complaints against his deputies. The complaint was UNFOUNDED.

96. In December of 2017, a citizens complaint (2017-AI-0037) filed by the IRSO Pursuit Review Panel determined all of CAMPBELL's actions/inactions during a vehicular pursuit on December 12, 2017, were found to be not in accordance with General Order 4091.00- *Pursuit of Motor Vehicles.* CAMPBELL was found in violation of General Order 2531 VII Job Knowledge and Performance and General Oreder IV Neglect of Duty, for commanding deputies under his supervision to engage in a vehicle pursuit that reached speeds of 140mph. The suspect was wanted for burglary, which is not a pursuable crime. Complaint was SUSTAINED.

97. In February of 2018, a citizen's complaint (2018-CC-0011) was filed as to CAMPBELL using excessive force and pushing a woman in her own home causing her to fall. The complaint was UNFOUNDED.

98. In March of 2018, a citizen's complaint (2018CC-013) was filed as to CAMPBELL striking a woman who was handcuffed and using excessive force against her. The complaint was UNFOUNDED.

99. In January of 2019, a complaint (2018AI-056) was filed by Captain Dan Acosta who was employed by Sebastian Police Department as to CAMPBELL injecting himself into the investigation of Officer McKenzie who had arrested Christopher Klien on a charge of DUI. Klien was CAMPBELL's friend and because of CAMPBELLS interference in the investigation, which was being conducted by a different agency, Klien was released with no charges. CAMPBELL tried to get McKenzie to let Klien go and when that didn't work

instructed Klien to request a blood test. CAMPBELL showed up at the hospital to make sure McKenzie would release Klien. CAMPBELL gave this statement to IA investigators *"I did mention to him that uh, that uh, they would will do the blood test, because your triple 0's that we'll just, they'll just cut you loose."* Despite overwhelming evidence including a confession that CAMPBELL interfered in the investigation, IA still found the alleged violations of General Order 2531.00 Code of Conduct (VII) Unbecoming Conduct Offenses (HH) Misdirected Action or Interfering with Official Investigations, as NOT SUSTAINED. CAMPBELL's disregard for policy and IA's complete incompetence to hold deputies accountable for their actions.

*100.* In January 2018, a article in THE US OBSERVER was written by Joseph Snook in reference to a lawsuit being filed that named IRSO and CAMPBELL as defendants. Minister Fred Luongo alleged that he suffered serious injuries by CAMPBELL while being falsely arrested. In the news article Snook writes, the suit further claimed, *"law enforcement officer (Kent Campbell) rapidly accosted the plaintiff, Frederick F. Luongo, and without uttering a word, lurched open the door to the Plaintiff's vehicle and attempted to snatch him out of the vehicle."* Although Minister Luongo was *"fully compliant"* with commands given by Lieutenant Kent Campbell, he was, *"abruptly and viciously ambushed"* by Lieutenant Campbell. Minister Luongo was, *"smashed into his vehicle"* by Kent Campbell. The lawsuit further claimed, *"Upon impact, the Plaintiff, FREDERICK F. LUONGO, was knocked unconscious..."*

101. With disregard of the rights of the citizens that IRSO and its deputies encounter, LOAR has deliberately either failed to direct, failed to fully require, or has tried to limit, IRSO and others in the proper investigation of the extreme and unlawful acts of his deputy

sheriffs, especially regarding CAMPBELL. It was LOAR'S policy and practice of limiting

investigations of sheriff deputies with very little or no serious questions raised regarding

the deputy sheriffs' actions or to the claims made by citizens against a deputy sheriff.

102.     Because investigations were limited and were not properly investigated, findings

of no excessive force and accepting the deputy sheriffs' word as truth and somehow

finding justification for his sheriff deputies extreme and violent behavior, LOAR has

consented to the deputy sheriffs unlawful conduct of CAMPBELL and MATHISEN.

103.     If LOAR had not consciously engaged in the foregoing by keeping a blind eye to

the actions of his sheriff deputies and their supervisors, and would of properly

investigated and punished (including termination and charging deputies with crimes that

they committed) sheriff deputies who violated the law and IRSO policy, then the actions

of CAMPBELL and MATHISEN would of never taken place and the damages HOLMES

suffered would not of occurred and there would have been no need to bring this lawsuit.

104. The actions in this case committed by CAMPBELL and MATHISEN were caused by

the policies, practices and customs of LOAR in the failing of his duties as previously

alleged in this Complaint.

105.     . CAMPBELL has a extensive history of reports of violations of rules and

regulations with IRSO and in addition to numerous complaints of CAMPBELL using

excessive force and unprovoked violence towards citizens, all of which LOAR was

aware.

106.     CAMPBELL knew that several deputy sheriffs either witnessed him beating

HOLMES or witnessed the aftermath of him beating and violating HOLMES' civil rights.

CAMPBELL also knew that these deputies, who were likely all under his direct

supervision, would turn a blind eye to his illegal and extreme conduct. If CAMPBELL

had not known his deputies would cover for his misconduct, then the damage that

HOLMES suffered would likely never of happened.

107.    If sheriff deputies would have known that they were not free to lie on police

reports and write false narratives, then it is likely CAMPBELL would of only used the

appropriate level of force necessary to arrest HOLMES and his rights would not of been

violated.

108.    CAMPBELL was many if not all the responding deputy's immediate supervisor.

It is very likely that if deputies such as MATHISEN were to ever find themselves in a

situation that required CAMPBELL to look the other way or to cover up some kind of

illegal behavior they had engaged in, CAMPBELL would have no choice but to either

cover it up or risk himself be held responsible for his past misconduct.

109.    MATHISEN either knew or should of known that neither of the two warrants that

he was attempting to serve on HOLMES qualified under IRSO policy for him to initiate

and engage in a vehicle pursuit of HOLMES. MATHISEN also knew or should of known

that initiating and engaging HOLMES in a vehicular pursuit while he was operating a

vehicle that was not equipped with the emergency equipment (lights and sirens) was

against IRSO policy and Florida law. Had MATHISEN known that he was not free to

disregard policy as he wishes and that such conduct was regularly being investigated by

LOAR and his staff when such instances came to their attention, he likely would not of

engaged in his unreasonable and unlawful vehicle pursuit of HOLMES and the injuries

and damages that he suffered would of never occurred.

110.      In addition to the policies, customs and practices referenced above, LOAR was grossly negligent, reckless and deliberately disregarded the health, safety and welfare of HOLMES and the citizens of Indian River County in that LOAR expressly acknowledged and approved to the failure to properly train, supervise, control and review for continued employment, the conduct of MATHISEN and CAMPBELL. And as a result, LOAR had reason to know that CAMPBELL and MATHISEN would act unlawfully, and he failed to stop either CAMPBELL's or MATHISEN's actions.

111.      The gross negligence, deliberate, and reckless behavior of LOAR identified above was a further underlying cause of the constitutional violations committed by CAMPBELL and MATHISEN and was the immediate cause of HOLMES's injuries and damages mentioned above.

112.      The Plaintiff reserves the right to amend the Complaint to correct legal errors or omissions due to his inexperience in legal matters, or to supplement additional information, which is revealed through discovery, or for any other reason. Plaintiff asks this Court to recognize the fact that Pro Se litigants' pleadings are to be construed liberally and held to less stringent standards than lawyers.


WHEREFORE, Plaintiff demands judgment against LOAR, CAMPBELL, and MATHISEN for actual damages, pain, suffering and emotional distress, special damages including past and future lost earnings, crippling anxiety necessitated solely by CAMPBELL and MATHISEN's illegal and improper acts, and demands a jury trial of all issues triable.

## JURY DEMAND

A demand for a jury trial is hereby made.

Date of signing: 3/8/23

Signature of Plaintiff _____

Ryan Holmes
Louieholmes08@gmail.com
1050 10th Pl.
Vero Beach, FL. 32960
772-559-9965

State of ID   County of Ada
The foregoing instrument was acknowledged before me
this 8 day of march      20 23
by Ryan Holmes
_____ Notary Public
My Commission Expires 09/23/2025

Grace Louise-White Galvan
Commission Number: 20191962
Notary Public
State of Idaho
My Commission Expires: 09/23/2025

31

**Extremely Urgent**

This envelope is for use with the following:

Visit **theupsstore.com** to find a location near you.

**Domestic Shipments**

- To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shipments**

- The UPS Express Envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment is classified as a document.
- To qualify for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz., will be billed by weight.

**Note:** Express Envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.

RYAN HOLMES
(772) 559-9965
THE UPS STORE #4172
6558 S FEDERAL WAY
BOISE ID 83716-9277

SHIP
TO: US DISTRICT COURTHOUSE
RM 1016
101 S US HIGHWAY 1
FORT PIERCE FL 34950-4209

UPS NEXT DAY AIR

FL 349 1-01

TRACKING #: 1Z 3Y1 F85 01 6292 6636

BILLING: P/P

REF #1: GO
REF #2: CUSTOMER

0.5 LBS LTR 1 OF 1
SHP WT: LTR
DATE: 08 MAR 2023

Serving you for more th
United F

100% Recycled fiber
80% Post-Consumer